**BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: EYEWEAR ANTITRUST LITIGATION | MDL No. _____ |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO
TRANSFER FOR COORDINATED AND/OR CONSOLIDATED PRETRIAL
PROCEEDINGS IN THE SOUTHERN DISTRICT OF NEW YORK
PURSUANT TO 28 U.S.C. § 1407**

**TABLE OF CONTENTS**

<u>**Page**</u>

I. INTRODUCTION ...........................................................................................................1

II. BACKGROUND ..............................................................................................................2

III. ARGUMENT....................................................................................................................5

    A. The Panel Should Transfer the Actions for Coordinated or Consolidated Pretrial Proceedings Pursuant to 28 U.S.C. § 1407 ..................................................5

        1. The Actions Involve Common Questions of Fact.......................................6

        2. Centralization Will Promote Efficiency and Minimize Inconvenience to the Parties and Witnesses ................................................8

    B. The Southern District of New York Is the Appropriate Transferee District..........10

        1. The Largest Volume of Evidence Is in the Southern District of New York..................................................................................................11

        2. The Southern District of New York Is a Central and Convenient Forum.........................................................................................................13

        3. The Relative Caseloads Favor the Southern District of New York ..........14

        4. The Eastern District of New York Is Also an Appropriate Transferee District .....................................................................................15

    C. In the Alternative, the Panel Should Transfer the Actions to the Northern District of Illinois...................................................................................................15

IV. CONCLUSION...............................................................................................................16

## **TABLE OF AUTHORITIES**

Page(s)

### CASES

*In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*,
    598 F. Supp. 2d 1366 (J.P.M.L. 2009) ............................................................................ 12

*In re Auto Body Shop Antitrust Litig.*,
    37 F. Supp. 3d 1388 (J.P.M.L. 2014) .............................................................................. 7

*In re: BP p.l.c. Sec. Litig.*,
    734 F. Supp. 2d 1376 (J.P.M.L. 2010) ...................................................................... 10, 14

*In re: Cast Iron Soil Pipe & Fittings Antitrust Litig.*,
    999 F. Supp. 2d 1368 (J.P.M.L. 2014) ....................................................................... 9, 10

*In re Darvocet, Darvon & Propoxyphene Prods. Liability Litig.*,
    780 F. Supp. 2d 1379 (J.P.M.L. 2011) ........................................................................... 14

*In re Deere & Co. Repair Servs. Antitrust Litig.*,
    607 F. Supp. 3d 1350 (J.P.M.L. 2022) ......................................................................... 7, 9

*In re Diisocyanates Antitrust Litig.*,
    341 F. Supp. 3d 1376 (J.P.M.L. 2018) ..................................................................... 6, 9, 12

*In re Direct Purchaser Plaintiff Beef Antitrust Litig.*,
    609 F. Supp. 3d 1412 (J.P.M.L. 2022) ............................................................................ 6

*In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Practices Litig.*,
    190 F. Supp. 3d 1361 (J.P.M.L. 2016) ........................................................................... 10

*In re Elec. Books Antitrust Litig.*,
    846 F. Supp. 2d 1378 (J.P.M.L. 2011) ........................................................................... 10

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
    277 F. Supp. 2d 1373 (J.P.M.L. 2003) ........................................................................... 12

*In re Inclusive Access Course Materials Antitrust Litig.*,
    482 F. Supp. 3d 1358 (J.P.M.L. 2020) .......................................................................... 7, 8

*In re: Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    24 F. Supp. 3d 1361 (J.P.M.L. 2014) ........................................................................... 7, 8

*In re Korean Air Lines Co., Ltd., Antitrust Litig.*,
    528 F. Supp. 2d 1372 (J.P.M.L. 2007) ........................................................................... 12

*In re Local TV Advert. Antitrust Litig.*,
    338 F. Supp. 3d 1341 (J.P.M.L. 2018) ........................................................................... 12

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
   290 F. Supp. 2d 1374 (J.P.M.L. 2003) ............................................................. 14

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
   289 F. Supp. 3d 1332 (J.P.M.L. 2018) ............................................................... 7

*In re Sensipar (Cinacalcet Hydrochloride Tablets) Antitrust Litig.*,
   412 F. Supp. 3d 1344 (J.P.M.L. 2019) ............................................................... 8

*In re Sugar Indus. Antitrust Litig.*,
   395 F. Supp. 1271 (J.P.M.L. 1975) .................................................................... 9

*In re Wells Fargo Auto Ins. Mktg. & Sales Practices Litig.*,
   273 F. Supp. 3d 1383 (J.P.M.L. 2017) ............................................................. 12

**STATUTES**

28 U.S.C. § 1407 ................................................................................................. *passim*

**RULES**

Judicial Panel on Multidistrict Litig., R. 6.2(e) ............................................................. 1

**OTHER AUTHORITIES**

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 20.131 (2004) ..................................... 10

MULTIDISTRICT LITIGATION MANUAL § 5:14 (2023) ........................................................ 7

I.     **INTRODUCTION**

Pursuant to 28 U.S.C. § 1407 and Rule of Procedure 6.2(e) of the Judicial Panel on Multidistrict Litigation, Moving Defendants[1] seek to transfer four related antitrust actions currently pending in three federal districts (the "Actions") for coordinated or consolidated pretrial proceedings. Plaintiffs in each of the Actions claim—based on the same alleged underlying conduct related to the manufacture and sale of consumer eyewear (*i.e.*, sunglasses and prescription glasses)—that Moving Defendants violated Section 1 and/or Section 2 of the Sherman Act. Plaintiffs purport to represent overlapping putative nationwide consumer classes. All of the Actions were filed within the last four months, and each is still in its infancy: no responsive pleadings have been filed, no initial case management conferences or discovery have taken place, and none of the nineteen (19) Defendants outside the United States have been served. Centralization in a single district will prevent inconsistent pretrial rulings, avoid duplicative discovery, and conserve judicial and party resources.

Moving Defendants request centralization in the Southern District of New York. That district has the strongest connection to this litigation, and the litigation will be conducted most efficiently there. The Southern District of New York encompasses the principal places of business of more Defendants than any other federal judicial district. It is also a geographically central and convenient forum for this litigation, which will involve a large number of witnesses based in Europe. Further, the Southern District of New York's substantial antitrust expertise and relatively low number of pending cases per judgeship make it an optimal forum for the efficient

---

[1] Moving Defendants are Costa del Mar, Inc., Essilor of America, Inc., EssilorLuxottica America SAS, EssilorLuxottica USA Inc., EyeMed Vision Care, LLC, For Eyes Optical Company, Frames for America, Inc., Luxottica of America Inc., Oakley, Inc., and Vision Source, LLC.

administration of pretrial proceedings in these Actions. For similar reasons, Moving Defendants believe that centralization in the Eastern District of New York would be appropriate as well.

In the alternative, Defendants request centralization in the Northern District of Illinois. One of the Actions is currently pending there, and Chicago is a reasonably convenient transportation hub for the U.S. and overseas witnesses involved in the litigation, as well as counsel for the parties.

## II. BACKGROUND

Plaintiffs in all of the Actions are consumers who allegedly purchased non-contact-lens eyewear. They bring these Actions asserting violations of Section 1 and/or Section 2 of the Sherman Act based on Moving Defendants' alleged exclusive intellectual property ("IP") licenses, supply and distribution agreements, supposed steering practices, mergers and acquisitions, and related conduct. One of the Actions (*Fathmath*) names 34 IP licensors and eyewear manufacturers with whom Moving Defendants allegedly do business as Defendants, while the three other Actions make allegations regarding those same 34 entities.

As of the date of this Motion, there are four Actions pending in three federal districts: one in the Northern District of California, two in the District of Minnesota, and one in the Northern District of Illinois. *Fathmath v. EssilorLuxottica S.A. et al.*, was filed on July 21, 2023 in the Northern District of California. *See* Complaint, No. 3:23-cv-03626 (N.D. Cal. July 21, 2023). Three putative class actions then followed: *Morgan v. EssilorLuxottica S.A. et al.*, filed on October 3, 2023 in the District of Minnesota (*see* Complaint, No. 0:23-cv-03065 (D. Minn. Oct. 3, 2023)); *Jonas et al. v. EssilorLuxottica S.A. et al.*, filed on October 5, 2023 in the District of Minnesota (*see* Complaint, No. 0:23-cv-03082 (D. Minn. Oct. 5, 2023)); and *Brown v. EssilorLuxottica S.A. et al.*, filed on October 20, 2023 in the Northern District of Illinois (*see*

2

Complaint, No. 1:23-cv-15176 (N.D. Ill. Oct. 20, 2023)).  Plaintiffs in each Action are represented by different counsel.

Plaintiffs in these four Actions purport to represent overlapping putative consumer classes.  Although worded in slightly different ways, all four Plaintiff groups seek to represent all persons in the United States who purchased directly from Moving Defendants any non-contact-lens eyewear of a brand owned or licensed by Moving Defendants.  Specifically:

- The *Fathmath* (N.D. Cal.) Plaintiff seeks to represent "all persons in the United States who have purchased any non-contact-lens eyewear product of a brand owned or licensed by [Moving Defendants], or for which [Moving Defendants] ha[ve] a Sales Agreement, including the brands of the Fashion Houses and Competing Eyewear Entities" (*Fathmath* Compl. ¶ 126);

- The *Morgan* (D. Minn.) and *Brown* (N.D. Ill.) Plaintiffs seek to represent "[a]ny person in the United States who purchased . . . one or more of [Moving] Defendants' Proprietary Brands or Licensed Brands of Eyewear directly from one or more of [Moving] Defendants' Retail Outlets or [Moving] Defendants' co-conspirators" (*Morgan* Compl. ¶ 131; *Brown* Compl. ¶ 131); and

- The *Jonas* (D. Minn.) Plaintiffs seek to represent "[a]ll persons in the United States who have purchased any of [Moving Defendants'] Proprietary Brands, Fashion House Licensed Brands, and the brands of Premium-Branded Eyewear Competitors . . . directly from [Moving Defendant]-owned or operated physical or online retail outlets" (*Jonas* Compl. ¶ 126).

3

All of the Actions assert antitrust claims under the Sherman Act based on the same underlying alleged conduct and on behalf of the same putative class:

| Case | Section 1 (15 U.S.C. § 1) | Section 2 (15 U.S.C. § 2) |
|---|---|---|
| *Fathmath* (N.D. Cal.) | X | |
| *Morgan* (D. Minn.) | | X |
| *Jonas* (D. Minn.) | X | X |
| *Brown* (N.D. Ill.) | | X |

Each Action is premised on the same—often verbatim—allegations of anticompetitive conduct. For instance, all four Actions allege that Moving Defendants engaged in the following conduct that supposedly harms competition:

- Exclusive IP licenses allowing Moving Defendants to make and sell the IP licensors' branded eyewear (*Fathmath* Compl. ¶¶ 78(a), 80-86; *Morgan* Compl. ¶¶ 49-56; *Jonas* Compl. ¶¶ 6-8, 69-76, 138; *Brown* Compl. ¶¶ 49-56);

- Supply agreements allowing Moving Defendants to sell other eyewear manufacturers' eyewear in their retail outlets (*Fathmath* Compl. ¶¶ 78(b), 87-94; *Morgan* Compl. ¶¶ 57-61; *Jonas* Compl. ¶¶ 77-81, 138; *Brown* Compl. ¶¶ 57-61);

- Distribution agreements pursuant to which Moving Defendants sell their own eyewear brands to third-party retailers (*Fathmath* Compl. ¶¶ 78(c), 100; *Morgan* Compl. ¶¶ 62-63; *Jonas* Compl. ¶¶ 82-84; *Brown* Compl. ¶¶ 62-63);

- Mergers and acquisitions of and by Moving Defendants (*Fathmath* Compl. ¶¶ 69-72; *Morgan* Compl. ¶¶ 31-42; *Jonas* Compl. ¶¶ 57-68, 138; *Brown* Compl. ¶¶ 31-42); and

- Supposed steering practices at eyecare providers and insurers associated with Moving Defendants (*Fathmath* Compl. ¶¶ 103-21; *Morgan* Compl. ¶¶ 81-88; *Jonas* Compl. ¶¶ 91-94; *Brown* Compl. ¶¶ 81-88).

Plaintiffs allege not only the same anticompetitive conduct on behalf of the same consumers, but also the exact same harm in the same or similar alleged markets. Plaintiffs in each Action claim that, as a result of the same alleged conduct, consumers paid higher prices for eyewear. *See Fathmath* Compl. ¶¶ 1, 99, 101, 122-23; *Morgan* Compl. ¶¶ 62, 64-69; *Jonas* Compl. ¶¶ 55, 101, 169; *Brown* Compl. ¶¶ 61-62, 64-65, 69-70, 125. Plaintiffs in *Fathmath*, *Morgan*, and *Brown* allege the same market of non-contact-lens, prescription and non-prescription, sunglasses and eyeglasses, *see Fathmath* Compl. ¶ 61; *Morgan* Compl. ¶¶ 104-06; *Brown* Compl. ¶¶ 104-06, and Plaintiffs in *Jonas* allege a subset of that market for "premium-branded" eyewear, *see Jonas* Compl. ¶ 41. All Plaintiffs allege that the relevant geographic market is the United States. *Fathmath* Compl. ¶ 61; *Morgan* Compl. ¶ 107; *Jonas* Compl. ¶ 41; *Brown* Compl. ¶ 107.

All of the Actions are in their infancy. None of the Defendants has responded to any of the Complaints. None of the nineteen (19) non-U.S. Defendants has even been served or agreed to waive service. No discovery has taken place, and none of the courts in which the Actions are currently pending has held an initial case management conference.

### III.  ARGUMENT

#### A.  The Panel Should Transfer the Actions for Coordinated or Consolidated Pretrial Proceedings Pursuant to 28 U.S.C. § 1407

The Panel may transfer "civil actions involving one or more common questions of fact [that] are pending in different districts" to a single district "for coordinated or consolidated pretrial proceedings." 28 U.S.C. § 1407(a). Centralization is warranted if it "will be for the convenience

of parties and witnesses and will promote the just and efficient conduct of [the] actions." *Id.* These criteria are easily satisfied here.

### 1. The Actions Involve Common Questions of Fact

The Actions unquestionably involve "one or more common questions of fact." *Id.* They share overlapping class definitions, the same core allegations of supposedly anticompetitive conduct, and common Defendants and alleged co-conspirators or relevant parties. All of the claims rest on the same underlying alleged facts: exclusive IP licenses between Moving Defendants and IP licensors, supply and distribution agreements, mergers and acquisitions involving Moving Defendants, and supposed consumer steering practices. Each Complaint asserts that the alleged conduct constitutes price-fixing or monopolization (or both) in an alleged eyewear market, in violation of the Sherman Act. Given the overlapping allegations and legal claims, common questions will include: (1) whether there are relevant product markets for consumer eyewear or premium-branded consumer eyewear; (2) whether any Defendant has market power in any alleged market; (3) the existence of agreements among Moving Defendants and named or unnamed co-conspirators; (4) whether any of the alleged conduct harms competition; and (5) whether any consumer class of eyewear purchasers should be certified.

The Panel routinely orders centralization where, as here, cases pending in different districts involve the same core antitrust allegations. *See, e.g.*, *In re Diisocyanates Antitrust Litig.*, 341 F. Supp. 3d 1376, 1377-78 (J.P.M.L. 2018) (centralizing antitrust actions to "prevent inconsistent pretrial rulings, especially with respect to class certification," where actions involved "complex factual questions arising from allegations that defendants engaged in a [price-fixing] conspiracy"); *In re Direct Purchaser Plaintiff Beef Antitrust Litig.*, 609 F. Supp. 3d 1412, 1413 (J.P.M.L. 2022) (centralizing antitrust actions that "share[d] factual questions arising from plaintiffs' allegations that . . . defendants exploited their market power . . . by conspiring to limit the supply, and fix the

6

prices, of beef sold in the U.S. wholesale market"); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 289 F. Supp. 3d 1332, 1334 (J.P.M.L. 2018) (centralizing three actions where all of actions "share[d] factual questions arising from [defendant's] alleged anticompetitive scheme" and asserted claims "on behalf of overlapping putative classes"); *In re Inclusive Access Course Materials Antitrust Litig.*, 482 F. Supp. 3d 1358, 1359 (J.P.M.L. 2020) (centralizing antitrust actions that arose "from a common factual core," even though the plaintiffs purported to represent different classes); *In re Deere & Co. Repair Servs. Antitrust Litig.*, 607 F. Supp. 3d 1350, 1351 (J.P.M.L. 2022) (centralizing antitrust actions that "share[d] factual issues arising from allegations that, through various anticompetitive practices, [defendant] has monopolized the [alleged] market"); *see also* MULTIDISTRICT LITIGATION MANUAL § 5:14 (2023) (complex antitrust cases are "a category of actions that the Panel almost inevitably orders transferred if there are multiple actions pending in different districts").

As the Panel has explained: "Section 1407 does not require a complete identity or even a majority of common factual issues as a prerequisite to centralization." *In re: Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 24 F. Supp. 3d 1361, 1362-63 (J.P.M.L. 2014) (citation omitted) (ordering centralization despite "some individualized factual issues"). In particular, neither "the presence of . . . differing legal theories" nor incomplete "identity of . . . parties" is a "prerequisite to transfer." *In re Auto Body Shop Antitrust Litig.*, 37 F. Supp. 3d 1388, 1390 (J.P.M.L. 2014); *see also In re Inclusive Access Course Materials Antitrust Litig.*, 482 F. Supp. 3d at 1359 (ordering centralization where certain "plaintiffs assert[ed] some causes of action not found in the other actions," because "where common factual issues exist, the presence of different legal theories among the actions is not a bar to centralization" (citation omitted)). Here, the Actions variously label the same alleged conduct as violations of Section 1 (*Fathmath*),

Section 2 (*Morgan* and *Brown*), or both (*Jonas*). Likewise, the IP licensors and other eyewear manufacturers with whom Moving Defendants are alleged to do business are named as Defendants in *Fathmath*, and are identified in allegations in *Jonas*, *Morgan*, and *Brown*. It is undeniable that the Actions "all arise from a common factual core," *In re Inclusive Access Course Materials Antitrust Litig.*, 482 F. Supp. 3d at 1359, and thus they should be transferred for coordinated or consolidated pretrial proceedings in a single district.

### 2. Centralization Will Promote Efficiency and Minimize Inconvenience to the Parties and Witnesses

Centralization promotes efficiency and convenience within the meaning of Section 1407 if it "will eliminate duplicative discovery, the possibility of inconsistent rulings on class certification and other pretrial matters, and conserve judicial and party resources." *In re Sensipar (Cinacalcet Hydrochloride Tablets) Antitrust Litig.*, 412 F. Supp. 3d 1344, 1346 (J.P.M.L. 2019). This standard is easily met in this case.

***Duplicative Discovery.*** Centralizing the Actions in the same district will reduce duplicative discovery and conserve resources. The Complaints share factual allegations and assert the same and similar claims; there will be extensive duplicative discovery if the cases are not transferred and centralized before the same court. For example, if the Actions survive the pleading stage, each will require the same exact discovery from Moving Defendants, who have been named in all Actions. Plaintiffs in each Action will seek the same agreements, communications, and data from Moving Defendants, and they will seek depositions of the same employees of Moving Defendants. Moreover, Plaintiffs in each Action will likely seek discovery—including employee depositions—from the IP licensors and eyewear manufacturers identified in all four Actions. Centralization would eliminate this substantial duplication of efforts, and the Panel has previously ordered centralization for precisely this reason. *See, e.g.*, *In re: Keurig Green Mountain Single-*

8

*Serve Coffee Antitrust Litig.*, 24 F. Supp. 3d at 1363 (centralization would "ensure[] that common witnesses are not subjected to duplicative discovery demands"); *In re Diisocyanates Antitrust Litig.*, 341 F. Supp. 3d at 1377-78 (centralizing antitrust actions where "discovery [was] likely to be international in scope and [would] include a significant number of nonparties").

***Inconsistent Rulings and Overlapping Classes.*** Absent transfer to a single court, the parties would have to litigate—and multiple district courts would have to resolve—identical and similar legal issues and discovery disputes multiple times. Centralization will avoid the risk of inconsistent pretrial rulings, including on motions to dismiss, discovery disputes (if the cases survive the pleadings stage), class certification, summary judgment, *Daubert* issues, and other pretrial matters. That risk is especially acute where, as here, the Complaints assert the same and similar legal claims based on the same alleged conduct and on behalf of overlapping putative classes whose interests are ostensibly represented in multiple jurisdictions. All Actions seek to certify nationwide classes of consumers who purchased eyewear. The Panel frequently orders centralization where the risk of inconsistent rulings is substantial, as it is here. *See, e.g.*, *In re: Cast Iron Soil Pipe & Fittings Antitrust Litig.*, 999 F. Supp. 2d 1368, 1369 (J.P.M.L. 2014) (ordering centralization where plaintiffs brought "actions on behalf of virtually identical nationwide classes"); *In re Deere & Co. Repair Servs. Antitrust Litig.*, 607 F. Supp. 3d at 1351 (centralization will "prevent inconsistent pretrial rulings, particularly with respect to class certification"); *In re Diisocyanates Antitrust Litig.*, 341 F. Supp. 3d at 1378 (same); *In re Sugar Indus. Antitrust Litig.*, 395 F. Supp. 1271, 1273 (J.P.M.L. 1975) ("We have consistently held that transfer of actions under Section 1407 is appropriate, if not necessary, where the possibility of inconsistent class determination exists.").

***Procedural Posture.*** Transfer is particularly appropriate here because the Actions are still in the earliest stages of litigation. No Defendant has responded to any Complaint. Many Defendants have not even been served. None of the transferor courts has entered a case schedule or held a case management conference. Because the transferor courts have not yet taken or had to take any substantive actions, centralization will not result in the duplication of efforts by the transferee court or the parties. *See, e.g.*, *In re Elec. Books Antitrust Litig.*, 846 F. Supp. 2d 1378, 1379 (J.P.M.L. 2011) (finding centralization appropriate where "[a]ll actions" had "not progressed beyond the filing of the complaints").

### B.  The Southern District of New York Is the Appropriate Transferee District

In selecting the appropriate transferee district, the Panel considers factors such as: the location of witnesses and evidence; convenience for the parties and witnesses; and the experience and caseload of the relevant judicial district. *See, e.g.*, *In re: Cast Iron Soil Pipe & Fittings Antitrust Litig.*, 999 F. Supp. 2d at 1369 (transferring actions to the district where defendants and their trade association had their principal places of business, and where "primary witnesses and documentary evidence likely will be located"); *In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Practices Litig.*, 190 F. Supp. 3d 1361, 1363 (J.P.M.L. 2016) (transferring actions to the midwestern district in which the defendant was headquartered; "although this litigation is nationwide in scope, its center of gravity is in the central portion of the country"); MANUAL FOR COMPLEX LITIGATION (FOURTH) § 20.131 (2004). Here, the Southern District of New York is the most appropriate transferee district considering the location of witnesses and evidence, geographic convenience, and the district's experience and caseload. The lack of a pending case in the Southern District of New York is of no moment. *See, e.g.*, *In re: BP p.l.c. Sec. Litig.*, 734 F. Supp. 2d 1376, 1379 (J.P.M.L. 2010) (ordering actions centralized in a district where no case was then pending;

10

"that no constituent action is currently pending in the Southern District of Texas is not an impediment to its selection as the transferee district").

### 1. The Largest Volume of Evidence Is in the Southern District of New York

The Southern District of New York is likely to have more relevant witnesses and documents than any other judicial district nationwide. Of the 28 Defendants in the United States identified across the Actions, over half of them (16) are alleged to have a principal place of business in the New York City area.[2] Certain Moving Defendants' primary U.S.-based marketing, strategy, and retail sales operations are located in New York.[3] Likewise, New York City is an important office location for many Moving Defendants—one where many of the companies' U.S. leaders are based or visit regularly.[4] Further, three Defendants are alleged to have a principal place of business in New Jersey, and another Defendant is alleged to have a principal place of business in Connecticut.[5] According to Plaintiffs' allegations, the tristate area is a potential location of witnesses and documents for at least 20 parties in the litigation.

No other district comes close to the Southern District of New York in terms of a connection to the litigation. None of the Defendants are incorporated in or have principal places of business

---

[2] These are: EssilorLuxottica USA Inc., *see* Decl. of Belinda S Lee in Support of Defs.' Mot. to Transfer for Coordinated and/or Consolidated Pretrial Proceedings in the Southern District of New York Pursuant to 28 U.S.C. § 1407 ("Lee Decl.") ¶ 3; Brunello Cucinelli, USA, Inc., *Fathmath* Compl. ¶ 28; Bulgari Corporation of America, *id.* ¶ 29; Burberry Limited, *id.* ¶ 32; Chanel, Inc., *id.* ¶ 34; Dolce & Gabbana USA Inc., *id.* ¶ 36; Versace USA, Inc., *id.* ¶ 39; Giorgio Armani Corporation, *id.* ¶ 41; Michael Kors (USA), *id.* ¶ 42; Prada USA Corporation, *id.* ¶ 44; Ralph Lauren Corporation, *id.* ¶ 45; Tapestry, Inc., *id.* ¶ 46; Tiffany & Co., *id.* ¶ 47; Tory Burch LLC, *id.* ¶ 48; LVMH Moët Hennessy Louis Vuitton Inc., *id.* ¶ 53; and Christian Dior, Inc., *id.* ¶ 55.
[3] Lee Decl. ¶ 4.
[4] Lee Decl. ¶ 5.
[5] These are: Kering Eyewear USA, Inc., Marcolin U.S.A. Eyewear Corp., and Thelios USA Inc. in **New Jersey**, *Fathmath* Compl. ¶¶ 51, 57, 59, and BBGI US, Inc. (f/k/a Brooks Brothers Group, Inc.) in **Connecticut**, *id.* ¶ 26.

11

in Minnesota or Illinois. Nor is California likely to be the location of any key witnesses or documents. Only Defendant Oakley, Inc. has its principal place of business in California—and it is located in Orange County, over 300 miles from the Northern District. For the vast majority of Defendants—43 of 49—their principal places of business are on the East Coast or in Europe.

The Panel regularly transfers actions to a district where "common evidence is likely located." *In re Local TV Advert. Antitrust Litig.*, 338 F. Supp. 3d 1341, 1343 (J.P.M.L. 2018) (transferring actions to the district in which a defendant "sued in all actions" had its "headquarters"); *see also, e.g.*, *In re Korean Air Lines Co., Ltd., Antitrust Litig.*, 528 F. Supp. 2d 1372, 1373 (J.P.M.L. 2007) (transferring actions to the district where "defendants maintain their primary domestic office" and therefore "where discovery may be found"); *In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 598 F. Supp. 2d 1366, 1368 (J.P.M.L. 2009) (transferring actions to a district where "pertinent documents and witnesses are likely located"). That district is often one in which the defendants are headquartered or have their principal place of business. *See, e.g.*, *In re Diisocyanates Antitrust Litig.*, 341 F. Supp. 3d at 1378 ("appropriate transferee forum" was one where "[o]ne defendant has its U.S. headquarters . . . and five other defendants have their headquarters in adjacent or nearby districts," and therefore "[r]elevant documents and witnesses . . . are likely to be located in or close to this area"); *In re Wells Fargo Auto Ins. Mktg. & Sales Practices Litig.*, 273 F. Supp. 3d 1383, 1384 (J.P.M.L. 2017) (transferring cases to district where "it [was] alleged that key entities and individuals with direct responsibility for the alleged conduct in this litigation are located . . . and, therefore, relevant documents and witnesses may be located there"). Here, that district is the Southern District of New York.

12

### 2. The Southern District of New York Is a Central and Convenient Forum

The Southern District of New York is a geographically convenient forum for a case in which numerous European parties and witnesses will need to travel to the United States. *See In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 277 F. Supp. 2d 1373, 1374 (J.P.M.L. 2003) (District of Connecticut was "a geographically convenient location" given "the location of principal defendants and potential defendants/witnesses in the eastern part of the United States and in Europe"). Twenty (20) of the Defendants in the Actions allegedly have their principal places of business in Europe.[6] The Southern District of New York affords out-of-town parties, witnesses, and counsel easy and convenient access to three major airports: John F. Kennedy International Airport, Newark Liberty International Airport, and LaGuardia Airport. As of the filing of this Motion, there are 29 direct flights per week from Milan, 146 direct flights per week from London (Heathrow), 67 direct flights per week from Paris (Charles de Gaulle), 142 direct flights per week from San Francisco, 24 direct flights per week from Minneapolis-St. Paul, and 55 direct flights per week from Chicago *to JFK alone*.[7] By contrast, travel to California, Minnesota, or Illinois would significantly increase travel time and time zone discrepancies for the parties and witnesses.

---

[6] Specifically, 6 Defendants are located in **France**: EssilorLuxottica S.A., *Fathmath* Compl. ¶ 11; Essilor International SAS, *id.* ¶ 13; EssilorLuxottica America SAS (formerly Luxottica U.S. Holdings Corp.), *Fathmath* Corporate Disclosure Statement, ECF No. 152; Kering S.A., *Fathmath* Compl. ¶ 49; LVMH Moët Hennessy Louis Vuitton SE ("LVMH"), *id.* ¶ 52; and Christian Dior SE, *id.* ¶ 54. Another 11 Defendants are located in **Italy**: Luxottica Group S.p.A., *id.* ¶ 12; Brunello Cucinelli S.p.A., *id.* ¶ 27; Bulgari S.p.A, *id.* ¶ 29; Dolce & Gabbana S.r.l., *id.* ¶ 35; Ferrari S.p.A., *id.* ¶ 37; Gianni Versace S.r.l., *id.* ¶ 38; Giorgio Armani S.p.A., *id.* ¶ 40; Prada S.p.A., *id.* ¶ 43; Kering Eyewear S.p.A., *id.* ¶ 50; Marcolin, S.p.A., *id.* ¶ 56; and Thélios S.p.A., *id.* ¶ 58. Burberry Group plc and Chanel Ltd. are located in the **United Kingdom**, *id.* ¶¶ 31, 33, and GrandVision BV is located in the **Netherlands**, *id.* ¶ 14.

[7] These figures are from www.flightconnections.com as of November 1, 2023.

13

### 3. The Relative Caseloads Favor the Southern District of New York

The Southern District of New York has the resources to conduct this complex antitrust proceeding. In particular, the Southern District of New York has a significantly lower number of cases per judgeship than the District of Minnesota or the Northern District of California:[8]

|  | Pending Cases Per Judgeship |
|---|---|
| **S.D.N.Y.** | 626 |
| **N.D. Cal.** | 989 |
| **D. Minn.** | 1,242 |
| **N.D. Ill.** | 564 |

The Panel often considers the relative docket conditions in determining where to transfer, and aims to avoid overburdening any one district's docket. *See, e.g.*, *In re Pressure Sensitive Labelstock Antitrust Litig.*, 290 F. Supp. 2d 1374, 1375-76 (J.P.M.L. 2003) (transferring actions to a district that "enjoys general docket conditions" allowing it to devote sufficient "resources to . . . the pretrial matters that this docket is likely to require").

The absence of a pending case in the Southern District of New York does not weigh against transfer to that district. The Panel recognizes that when, as here, "potential plaintiffs and putative class members . . . reside in every corner of the country and defendants are located in several states," the location of the cases filed to date "is not a particularly significant factor" in the Panel's decision on where to transfer. *In re Darvocet, Darvon & Propoxyphene Prods. Liability Litig.*, 780 F. Supp. 2d 1379, 1381 (J.P.M.L. 2011); *see also In re: BP p.l.c. Sec. Litig.*, 734 F. Supp. 2d at 1379 ("Because potential plaintiffs and putative class members will reside in every corner of

---

[8] *See* U.S. District Court – Judicial Caseload Profile, 12-Month Period Ending June 30, 2023, https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0630.2023.pdf (last visited Nov. 1, 2023).

14

the country, the location of the currently filed cases is not a particularly important factor in our decision. Similarly, that no constituent action is currently pending in the Southern District of Texas is not an impediment to its selection as the transferee district."). Regardless of whether a case has been filed in the Southern District of New York, it is the district with the closest connection to the litigation, and it has the resources to efficiently resolve these complex cases.

    **4.    The Eastern District of New York Is Also an Appropriate Transferee District**

For many of the same reasons that the Southern District of New York is the appropriate forum for this litigation, the Eastern District of New York is a close second. The Eastern District of New York is nearly as convenient for the parties and witnesses, given its proximity to many Defendants' principal places of business and its proximity to the same major airports as the Southern District of New York. In addition, the Eastern District of New York has 869 pending cases per judgeship—higher than the Southern District of New York, but lower than two of the three districts in which an Action is currently pending.[9]

**C.    In the Alternative, the Panel Should Transfer the Actions to the Northern District of Illinois**

In the alternative, the Panel should transfer the Actions to the Northern District of Illinois. That district is a convenient geographic location for travel from around the U.S. and from Europe. For instance, as of the filing of this Motion, Chicago offers more direct flights per week from Paris (Charles de Gaulle) and Milan than does Minneapolis-St. Paul or San Francisco—in fact, there are no direct flights at all between Milan and San Francisco or between Milan and Minneapolis.[10] And

---

[9] *See* U.S. District Court – Judicial Caseload Profile, 12-Month Period Ending June 30, 2023, https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0630.2023.pdf (last visited Nov. 1, 2023).

[10] These figures are from www.flightconnections.com as of November 1, 2023.

15

the Northern District of Illinois has a lower number of pending cases per judgeship than any other district in which an Action is currently pending.

## IV. CONCLUSION

For the foregoing reasons, Moving Defendants respectfully request that the Panel transfer the Actions for coordinated or consolidated pretrial proceedings in the Southern District of New York (or, in the alternative, in the Eastern District of New York or, in the second alternative, in the Northern District of Illinois).

Dated: November 1, 2023                    Respectfully submitted,

LATHAM & WATKINS LLP

By: */s/ Belinda S Lee*
Belinda S Lee

Belinda S Lee (CA 199635)
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: 415-391-0600
Facsimile: 415-395-8095
Email: belinda.lee@lw.com

*Attorneys for Defendants Costa del Mar, Inc., Essilor of America, Inc., EssilorLuxottica America SAS, EssilorLuxottica USA Inc., EyeMed Vision Care, LLC, For Eyes Optical Company, Frames for America, Inc., Luxottica of America Inc., Oakley, Inc., and Vision Source, LLC*